case for argument this morning, United States v. Wood. Good morning. Good morning. May it please the Court, my name is Peter Wolfe, I represent Mr. Wood. I think this is what one might call a classic example of what's really a fact-based appeal. I don't think there's any particularly controversial or uncertain principles of law that apply here. And our first claim, which really has three parts, is a sufficiency of the evidence claim. Although, to a certain extent, the first prong of the sufficiency claim is, it amounts to this. The government alleged a scheme to defraud in the indictment, which they didn't prove. They proved a different scheme to defraud. And in order to overcome that problem, the government essentially tries to urge upon this Court that what's really involved is a question of variance. And in order to advance that proposition, the government relies upon the phrase in the indictment, on or about. But the phrase on or about. You're saying the problem with the indictment is the date or it's the wrong victim? I was saying it didn't prove the one that was alleged. Was that because of the date or the date? It was because of the date. Okay. Because the government indicted, the grand jury indicted, the government. And alleged a scheme that began on or about in January of 2001. But the proof at trial demonstrated, if you take the proof and the light most favorable to government, the scheme began in, say, June 2000. And so the government, in answer to our argument, urges upon this Court that, well, what we have here is a variance problem. And they ask the phrase on or about to carry the load to demonstrate that it's an inconsequential variance. But that's too much work for on or about to do. And this Court has said in other cases that on or about is a phrase that's designed to avoid arguments, technical arguments, about whether something happened on a Tuesday when maybe it happened on a Monday or a Wednesday or possibly even on a Sunday. But on or about can't cover a six-month differential. And so what we have here is basically a situation where Mr. Wood was indicted for one crime, but he wasn't convicted of that crime. He was convicted of a different crime. And the problem with that, of course, is that the problem for me, what crime you claim he was, A, indicted for and, B, convicted for? What he was indicted for was a wire fraud scheme that began on or about January of 2001. What crime? 18 U.S.C. 1343. No, no, no. I mean, give me the substance of the crime. You said he was indicted for one crime and he was convicted of another crime. Did he rob Peter and then get convicted of robbing Paul? No. He was accused of robbing Peter in January, but the proof showed that he the scheme began in June. So in the middle of it, but what he was, what's in the indictment is, in fact, part of the scheme, correct? Well, that's not true. I mean. Well, but that, why is that not true? Because the government went to the trouble and the grand jury went to the trouble of voting on indictment that said, as to its first seven or eight paragraphs, background. And then it begins with another paragraph, the scheme to defraud. And right after the words, the scheme to defraud, comes the phrase on or about January 2001. So a plain reading of that is that the scheme began on or about January of 2001. But the proof. Do you agree that he was indicted for robbing, not robbing, but stealing from Moore and was convicted for stealing from Moore, not from Courtney? I agree that he. Well. So the victim is Moore. Moore PTH, right? All right. So the indicted victim is the convicted victim. Right. So all you're saying, if I understand you correctly, is that he was indicted for commencing a scheme on or about January 2001 to steal from Moore. But then evidence came in of what he was doing back in June of 2000. Right. Objected to? Well, there was no reason to actually, it was objected to, but the government said, well, this is background, Your Honor, and the district court admitted it, which I think was actually probably a correct evidentiary ruling. There wasn't any surprise. He knew what was coming up, right? Yes. This is not a question of surprise. This is a question of whether the Fifth Amendment indictment clause means anything. And if they did not. But I'm still having some trouble. So the prior conduct, when you say actually the scheme began, why isn't that appropriate background? It is appropriate background. What's inappropriate is to allege that the scheme begins in January of 2001, and then when you prove the scheme begins in June of 2000, you say, well, that doesn't make any difference. If the grand jury voted on an indictment that alleged the scheme began in January of 2001, if the government wanted to prove, and it seemed like they knew all about this because they put it in as background, that the scheme began in June of 2000, then why not have asked the grand jury to vote on that indictment? The defendant. Well, how would that affect the substantial right? It affects the substantial right only if you think that the Fifth Amendment's clause about indictment means anything, that you have to be. And we all agree that it means something. It means something important, but there's not always a remedy, even for a variance. Well, but the variance law that this Court has decided really would be, I would say, contorted in order to try to use it to cover a six to seven-month differential in the alleged date of the beginning of the scheme. The problem we have here is that the indictment, as it's set forth, is completely sufficient as an indictment. In other words, it's not subject to a dismissal motion or anything like it. But an objection was made to the introduction of the pre-January conduct. I believe it was. But you're not raising that on a point. No, I'm not raising it. It was error on the part of the Court to allow it to come in, right? I don't think that was error, because I think that the government is entitled to prove relevant background information to the charge that they've alleged. The problem is, is that when it came time for the Rule 29 motion, and it was pointed out to district court, that they haven't proved the scheme alleged in the indictment, the government said, well, and here's an actual quote, Your Honor, Your Honor, obviously, on or about is just that. It doesn't mean that the conspiracy, that must be a misspeaking of Mr. Osborne, began in January of 2001, and the act supporting the criminal conduct began when the scheme materialized in the defendant's mind. The scheme itself lasted for much longer, several months longer, probably June of 2000 until its end. That's the excerpt at 309.310. Now, on appeal, that was the government's argument to district court. On appeal, they've abandoned that claim, basically, and said, well, look at this as a variance. But this Court's cases on variance basically say variance problems can cover a couple-day differential. We're not concerned about the technicalities, whether something began on January 2nd or January 3rd or January 5th. But to go back and resolve this and say, well, June is close enough for government work, June of 2000 is close enough for government work as January 2001, that's just too much work for on or about to do. Kennedy. What's your best case for that proposition, that on or about doesn't cover six months for purposes of variance? The McCown case and the Cecil case, where the Court said in McCown that the phrase on or about doesn't open a time frame indefinitely. It opens up by one or two days. And that principle, although in a different context, was reaffirmed. But what I'm having trouble with is that even if we agree that it's a variance, the -- I'm not urging the variance argument. It's their argument. But if we even care to -- you're looking at it as a sufficiency argument? As a sufficiency. But I don't understand why it's a sufficiency argument. Because when you allege one scheme and prove another, you haven't proved the scheme you alleged. If you win this case, what's to prevent the government from presenting it to the grand jury again for the earlier period of time? Well, nothing except possibly the statute of limitations. But nothing -- Has the statute run? I would say that it probably has run, yes. Five-year statute? Five-year statute. Not told by the proceedings? Well, that would be the question. Right. But it seems to me that the -- I'd still get back to the prejudice issue and whether there was sufficient evidence to prove the scheme that was indicted, why wasn't there sufficient evidence to prove that? Because there was no evidence to demonstrate that a scheme began in January of 2001. So the stuff happened, but you're saying there's no evidence that it was a scheme. That's right. That's ‑‑ this is all as to our first prong of our sufficiency argument. As to our second prong, which maybe I better move on to, that has to do with a second dairy issue, a slightly different issue, which is that the government has to prove in a wire fraud case that the wire was an essential part of the scheme. And here what you have is a wire transmission takes place in late January, early February of 2001, and the wire is money sent to a person named Don Courtney. And the government argument is that because the money for the wire went or came from Pro Tour Hawaii, that somehow that made the wiring of it to Mr. Courtney an essential part of the scheme, but there was no evidence of that. Because what the proof was, was that ‑‑ I suggest to you how the wire fits into the scheme, at least for the purposes of the Jackson analysis as to the sufficiency of the evidence. Wood has peculated to the extent of perhaps $50,000 by February 2001. He needs more money to be put into PTH because he's promised them that he's going to put up 2.1 million of his own 100 million or more that he's got offshore. Maybe he doesn't have that money. Maybe Courtney does. So he calls Courtney up and he talks to a Waikupu country club and he gets Courtney to come over on PTH's dollar. And he starts talking to Courtney about PTH. And Courtney says he's so insistent that he even threatens him with injury. If he doesn't invest in PTH. And friend Wood doesn't want to talk about Waikupu country club. The wire is the money that gets Courtney to Hawaii so he can be leaned on by Wood. Why isn't that a factor in the fraud? Because the money that he's thinking about getting out of Courtney is going to cover the hole that he's already started in the PTH bank account by peculating. That would be a compelling analysis, Your Honor, if there was one fact in the proof, which there isn't, which was that Courtney, at the time the wire was sent, had the slightest inkling that that was what was going on. But the proof was. No, of course not. I mean, you usually don't. He's a mark. Yeah. You don't want to, like, fill him in. You want him to be clueless so that you can basically use him as the conduit for the money. I mean, why would he need to know? Well, in order for the scheme, for that wire to be part of the scheme. Because here's my view of the matter. If Mr. Wood takes $5,000 and, for example, buys a Sub-Zero refrigerator or a Viking stove with it, that doesn't make the purchase of the Viking stove an essential part of the scheme. It's just how he spent the money. If Mr. Wood takes PTH's $5,000, which was the allegation here, and uses it to induce Courtney to come to Hawaii in order to discuss the purchase of Waikapu Country Club on Maui, which Courtney testifies was the only reason he came and what the matter was about entirely, as far as he was concerned, then you have essentially the same thing. You don't have any proof that the wire transmission is an essential part of the scheme to defraud Pro Tour Hawaii. It may be part of a different scheme to try to separate Courtney from some of his money or to induce him to have something to do with the purchase of the Waikapu Club. But it's got nothing to do with the fraud of Pro Tour Hawaii because there's no evidence of it. And the government's answering brief essentially says that that's their view as well, because they seem to suggest that they've proved the case on this point when they've proved that the wire transfer was Wood's own private business purposes, which is their answering brief at 14. And their argument is essentially that after the proving that Wood stole the money, he made the wire transfer an essential part of the scheme to defraud. But that's – that can't be the case, because if the wire fraud is part of the scheme, there has to be some demonstration that the wiring is part of the scheme. And Your Honor's suggestion would be fine, except that there's no evidence of that. Kennedy, but do you want to address the sentencing issue? Yes. Let me – we have a number of sentencing issues, but let me just deal with, I think, the main one. I think the guidelines, the 2000 and 2005 guidelines is the issue that – Using the right book or the wrong book. And it makes a difference here depending on the district court's resolution if the district court had resolved. You know, it sort of seems like the district court did resolve the question of whether there's more than minimal planning, but it's slightly ambiguous because in using the 2005 book, which doesn't deal with more than minimal planning, maybe when the district court said that more than minimal planning has nothing to do with this case, the court was saying basically it doesn't have anything to do with the case under the 2005 book. Well, I have to go ahead. It found there was not more than minimal planning. And if that is a factual finding, which is how we read it, but I wanted to suggest that there's a little ambiguity, then using the 2000 book would have been advantageous to Wood. See, I thought there was – here's my question. It seems to me it's not clear that there was such a finding. And if the argument is, if it's a plain error standard. It's not plain error. And why is it not plain error? It's not plain error because here's what happened. In the draft PSR, the probation office used the 2000 book. Then in the – which nobody objected to, neither we nor the government objected. Then in the final PSR, without any notice, the probation office changed the book and started using the 2005 book, at which point we filed a supplemental sentencing statement objecting to the use of the book, at least to the extent that using that book would disadvantage the defendant, which it would if the Court's factual findings on more than minimal planning came out in favor of the defendant. So it's not plain error. It was brought to the district court's attention. The district court ruled on it to the extent that it used the 2005 book.  There's enough of an apparent finding or at least some ambiguity that it just should go back and let the district court say this or that. Well, I would actually prefer to take Judge Silas' view of the matter, which the district court did make the finding of more than minimal planning. But I want to be fair to the record, which is that in the context at which the sentencing came up, where Judge Ezra said, I'm using the 2005 book by adopting the PSR, one could take the view that once you determine that, you're not going to make any more rulings on what would have been findings on the 2000 book, because in the 2005 book, more than minimal planning is out of there. So, right. So, but if so, I guess I could say this. My best case is that the judge made a fact finding, in which case it should go back to redo it on the 2000 book. And my almost as good case is that it should go back for the district court to determine whether the 2000 book would advantage the defendant or disadvantage him, because it's a one-point swing either way. And it's possible that the 2000 book was worse, but we think that the 2000 book was one-point better. That's the reason why the defendant is entitled to a 2000 book rather than a 2005 book is rooted in concepts of ex post facto. That's right. Now, consider for a second, does ex post facto really bother us anymore since the Booker case, because the book is now advisory? I think it bothers us to the extent that Cantrell remains good law, which I think it does, which says that before advising itself about what the guidelines mean, the district court has to calculate them correctly, which includes using the right book. And so I think that it still makes a difference. So the little time I have, I'll reserve for my rebuttal. Thank you. Thank you. Good morning. May it please the Court, Les Osborne from the District of Hawaii for the United States. Quite frankly, throughout this case, both at the trial and on appeal, the government has had a difficult time grasping the defense argument. What was alleged in the indictment and what was proven at the trial was a scheme in which that began through the introduction of the defendant to Mr. Moore and was predicated, the entire scheme was predicated upon Mr. Wood's representations of great wealth and the ability to underwrite the PTH operation of Mr. Moore. The charging language in the wire fraud count specifically incorporates paragraphs 1 through 7, which is the preliminary matter through the scheme. Once Mr. Wood had established his position with the Moores, then began the misdemeanor misuse of the monies, which is set out in the indictment and was some $60,000-plus. Did the indictment say that the scheme began in January of 2001? It does indeed, Your Honor. But it also incorporates in the charging paragraph the reference to the conduct in 2000. That was that in 2000, Wood guaranteed the financial support and the prize money, et cetera, and then became the officer, chief financial officer. Yes, Your Honor. As to the Courtney transaction, perhaps Your Honor is quite right in your analysis, but the analysis that was relied upon by the government and argued by the government at the time of trial was that Mr. Wood, the defendant, used without anyone's knowledge or consent the $5,000 of PTH and some fees for the cashier's check to further still another scheme unrelated to this case, which was the funding of a dream he had to establish a defunct golf club at Waikapu and to move forward with that scheme. So you don't. Are you serious when you say what you just said? What you're saying then is that the wire fraud was totally independent of Wood stealing money from the Moors. Oh, no. No, no. And I didn't mean to say that. Wood stole the money from the Moors. That's clear. His purpose in stealing the money was to commit yet more fraud, but he obtained the $5,000 by virtue of the fraud charged in the indictment, and he misused the money for other fraudulent purposes. That's what I'm saying. And the victim of this fraud, these various checks, was Moors? Yes, definitely, Your Honor. And I thought, what's the suggestion that, although Courtney was coming over to talk about the Waikapu Country Club, that also there was some hope that he might be a sugar daddy to bail out Mr. Wood for this other commitment? Clearly, Mr. Wood came to that decision at some point. After Mr. Courtney arrived in Hawaii and it was clear that the whole PTH operation was collapsing, then Mr. Courtney did, in fact, try and enlist Mr. Wood did, in fact, try and enlist Mr. Wood's accounts for PTH. But he's that under status in Waikapu? Yes, yes. Where is Waikapu? It's on the island of Maui, and it's a golf course, which was once very popular, but for reasons unknown to me, has been abandoned. Where in Mallie? It's in the Lahaina area, but I'm not sure. Okay. I'm just curious. I'm not a golfer, Your Honor. I'm sorry. Mr. Osborne, I take judicial admissions by government attorneys very seriously, and I take it precisely. I take my note, after what you said, that the purpose of the wire fraud, the defendant used $5,000 to further another scheme unrelated to this case, a fairy tale regarding a defunct golf club. If we take that seriously, and I'm going to take you seriously, what you're saying is that the wire fraud was unrelated to the scheme of bilking the Moors. No, Your Honor. If I said that, and I'm sure I did, if you took those notes, I'm not arguing with that, that is not what I meant to say. All right. I will cross that out and give you another opportunity to say what you meant when you said it. What I precisely meant to say, Your Honor, was that Mr. Moore, pardon me, wrong again, that Mr. Wood stole $5,000 from the Moors and PTH to send to Mr. Courtney. And at the time of that theft and that transmission, the evidence suggests Mr. Wood was trying to use the stolen money to take a step forward in yet another scheme. But there is no doubt that he took it from the Moors and it was part of this scheme. Part of the wire fraud. Part of the wire fraud. It was the wire fraud. That's alleged in paragraph G. It says that he took this money from the account to be sent to another individual located in California. Is that the Courtney allegation? That's the Courtney allegation, and that's the evidence. But if it were to take a step for another scheme, then it wasn't a scheme laid in the indictment which started in January 2001 or thereabouts. Oh, yes, Your Honor, because it was the theft of the PTH money due to Mr. Wood's false representations. What I'm trying to communicate, apparently very unartfully, is that if a con man stole through false representations $10,000 from the victim and used the money he stole to buy a used car, the scheme is perfected at the time of the theft. It doesn't matter what he does with the money. And that's what happened here. Wood took the money without permission from PTH, Hawaii Golf Tours, for the purpose, for his own purposes, regardless of what they may be. Just like he took the money earlier from them for his own purposes. That's correct, Your Honor. To line his pockets. To line his pockets. But all the rest of the money went into his personal account, and this particular transaction was wired to a third-party account. That's correct. I believe it went through that personal account, but was wired ultimately from that account, from his personal account. What's your best case to show that a variance of six months or so on or about is okay? I guess it's a variance, Your Honor, which we have cited in our brief. And also is a Duran, I believe, that we cited. That doesn't go to the time element so much as to the substantial rights. But the government fails to see a variance here. We alleged an effort by the defendant to take advantage of the Moors by virtue of his false representations concerning great wealth. Through those representations, he became the CFO of the company. And once having become the CFO, looted it. It is as simple as that. I mean, that was the crime that was prosecuted. How did the wire help him loot? The wire helped him loot it by getting the money offshore to his — Courtney. To Courtney, yes, Your Honor. Couldn't have happened any other way. He could not have gotten that money to Courtney without having sent the wire. There isn't any wire fraud without that transmission, is there? That's correct, Your Honor. You have to have that. Yeah, have to have that. It would just be a Garden Variety, Hawaii theft prosecution without the wire. Yes, Your Honor. Do you want to talk about sentencing? Briefly, Your Honor, it's interesting that this did not really become a controversy until we were on appeal. In fact, counsel for the defense even told the judge that this was a procedural problem, not a real problem. And in the future, if the pre-sentence report was going to be amended, perhaps there should be some early notice. But at the sentencing proceeding, it appeared everybody was perfectly happy and the book issue was not a problem. And I think that primarily is because had the court used the 2000 book and not the 2005 book, the sentence for the defendant could have been even more onerous than it was. And I think the court's comments at the time of sentencing as to what it thought of the nature of the fraud in this case and the nature of the conduct of the defendant suggests that a more onerous sentence under the 2000 book may well have been the result. And that's, I mean, I can't infer things to Mr. Wolff, but I can say that the defense never argued for the use of that book at the time of sentencing. Kennedy, is it your position that there was no objection properly made at the sentencing? Absolutely, Your Honor. So in looking at the defense response to the PSR and talking about paragraph 32 having to do with the two-level increase, and they talk there about, because there wasn't more than one victim, and also that it didn't have more than minimal planning. So didn't that, I view that as an objection. Is that not an objection? Well, Your Honor, I think that's very muddled when you look at the day of sentencing to this colloquy. This is Mr. Wolff. All right. Then the other only slight matter of procedure that is really relevant to future cases is this. I thought it was a bit unusual that we change from the 2000 guideline to the 2005 guideline between the draft report and the final report. And, of course, the Court doesn't get the draft report. And nobody objected to the use of the old guideline, but then it just changed. And actually, I had overlooked it until I was reviewing this thing just last weekend. Mr. Osborne, when I called him about it, hadn't noticed it either at that point. So it seems to me that just maybe as a matter of procedure, if that kind of thing has happened, it goes on. But at no time is there an objection or a reassertion. The use of the new guideline. That's correct. And what is your view on whether or not there was a finding made with respect to minimal planning? The Court did not clearly opine on the issue of minimal planning. It didn't find, I find minimal planning here. That was not articulated. But the Court's comments on the defendant's conduct seem to imply that this was a planned fraudulent conduct. It was not, you know, taking advantage of the moment or a sua sponte sort of thing. Thank you. Thank you, Your Honor. Let me try to be brief. If I have any time, I can tell you where Waikapu is, Your Honor. But first I'd like to get to the other stuff first. Yeah, I think Judge Bea's point about the judicial admission is important. And the answering brief, I think, really carries our argument on this point. The government says in the answering brief the following things. At no time prior to Courtney's departure from California was there any conversation with Wood concerning PTAs. The Wood is, I'm inserting with him, that's at the answering brief at 11 and 12. And it conceded at 12 that Courtney's sole purpose for making the trip was to discuss investing in a golf resort with Wood. That's why Courtney got the 5,000. And the government said at 23 of the answering brief there's no evidence to suggest that Wood intended to involve Courtney in PTH at the time he sent the PTH money. And then I'm adding this by wire to Courtney's attorney. That's at 23. So I think the government made those concessions thinking they weren't relevant. But I think they are relevant because if the wire is just evidence of how Wood spent money that he stole, then the wire is not an essential part of the scheme. And then you don't have wire fraud. You have a Hawaii theft case which could have been prosecuted but wasn't. As to the indictment, how did the government argue that the wire was a substantial part of the scheme at trial? What bothers me is that the government kept going back to the wire as being instrumental in a new scheme. Exactly. But the judge left it up to the jury and that's why we think this is an insufficiency claim because no rational person could think in the face of that argument that it was an essential part of the scheme. The jury seemed to be troubled by it. They asked two questions at this point and the judge told them, gave them the definitions saying essential part means critical part but there could be more than one. And then when they came back and said, you know, we're still having a problem here, the jury basically said, look, there's nothing more I can say to you about this. And then the jury celebrated and told them about, you know, I don't know how many hours over, two and a half days. So I think they were troubled by this potentially. I mean, that's why we have an insufficiency claim. Because we think that these are misdemeanors at this point in time. I say a lot of time, but the only other point I want to make is this. The indictment goes out of its way to have a section called background, a section called stupidity law. You'll notice that in background they talked about Woolcock's representations in 2000, in June, about Gary Tate and stuff like that. In the – they talk about him becoming the chief financial officer in December 2000. And that is specifically said. In the possibly January 2001 – in the January 2001 – Wood knowingly devised a scheme. They say, when you use that language, then say that what you really meant was it all began in June. That's just taking this concept of Gary's and turning it on its head. They alleged a scheme. They proved a different scheme. And I just don't see how they end up with any meaningful consequences. I think all of this kind of thing is simply just swept away as being of areas that doesn't make really any difference at all. Thank you. Thank you, Mr. Wolf, Mr. Osborne. The case of United States v. Wood is submitted. The last case, United States v. Means, has been deferred pending some additional district court action. And we're adjourned for this morning. All rise. This court is adjourned.
judges: Siler McKeown, Bea